3:26-mj-00298

**DISTRICT OF OREGON, ss:** **AFFIDAVIT OF NATHAN HIBBS**

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Nathan Hibbs, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1. I am a Task Force Officer (TFO) for the Federal Bureau of Investigation and have a special deputation to investigate and enforce violations of Title 18 and Title 21 of the United States Code, which includes firearm and controlled substances offenses. I am a Police Detective employed by the City of Gresham Police Department, assigned as a criminal investigator to the Gresham Police Department (GPD) Investigations Division. I am a sworn police officer and have been for more than 20 years. I am currently assigned to the Multnomah County Sherriff's Office's (MCSO) Special Investigations Unit (SIU) investigating narcotics related crimes. I have conducted multiple investigations into weapons offenses and drug trafficking offenses. Through this training and experience, I have become familiar with the manner in which drug traffickers operate to carry out their criminal activity.

2. I submit this affidavit in support of a criminal complaint and arrest warrant for **STEVEN LEE GILL** (**GILL**), d.o.b. 03/xx/1980, for committing the felony offenses of:

a. Possession with Intent to Distribute a Mixture and Substance containing Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C);

b. Possession with Intent to Distribute a Mixture and Substance containing Methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C); and,

c. Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c) (hereinafter the Target Offenses).

As set forth below, there is probable cause to believe, and I do believe, that **GILL** committed the Target Offenses.

## Applicable Law

3. 21 U.S.C. § 841(a)(1) makes it unlawful for any person to knowingly or intentionally distribute or possess with intent to distribute a controlled substance.

4. 18 U.S.C. § 922(g)(1) makes it unlawful for a person convicted of a crime punishable by imprisonment for a term exceeding one year to possess either ammunition or a firearm which has traveled in interstate or foreign commerce.

## Statement of Probable Cause

5. On June 2, 2026, at part of drug investigation, the Honorable Judge Beckerman, United States Magistrate Judge signed a federal geolocation search warrant for the cellphone number 360-xxx-9474. I knew the phone number to be associated with **GILL**.

### July 14, 2026, Incident

6. On July 14, 2026 an SIU analyst informed us that **GILL's** phone was located around NE 181st and NE Glisan in the City of Gresham, Oregon. At this time we knew that

**GILL** currently had an outstanding federal supervised release violation warrant that had been issued out of the Western District of Washington.

7. I and other SIU investigators went to the shopping center in the area where the phone was located. We observed that **GILL's** vehicle, a 2019 Toyota 4Runner bearing Oregon license plate 857QBZ, was parked in the parking lot, unoccupied. It was unknown which business in the shopping center he was in. After approximately one hour **GILL** exited the Dotty's at that location and entered his vehicle. I directed investigators to arrest **GILL**. Two unmarked police vehicles pulled behind Gill's vehicle. **GILL** rapidly reversed into one of the vehicles with significant force, causing damage to a police vehicle. Then he rapidly accelerated forward into the civilian vehicles parked in front of him. One of which was occupied by an adult male and child, neither was injured during the incident, but were endangered by **GILL's** actions. Additionally one of the civilian vehicles was pushed into an FBI Task Force Officer, who was on foot, knocking the investigator over. After pushing the three civilian vehicles out of his way and causing significant damage to all of them, **GILL** drove rapidly out of the parking lot and away from the area.

8. A short time later using the same geolocation data investigators located **GILL's** vehicle parked, unoccupied and unlocked on a residential street in Vancouver, Washington. I had the vehicle towed to the SIU office in Oregon and secured.

9. On July 16, 2026, the Honorable Judge You, United States Magistrate Judge signed a search warrant for the vehicle. The warrant was executed the same day. Upon searching the vehicle investigators recovered approximately 20.8 grams of methamphetamine in a Ziplock partially under the driver's seat, as well as an additional 7.2 grams of methamphetamine and 14.3 grams of fentanyl in the center console of the vehicle. The

substances were field tested and both tested positive for their respective substances. I have found such field tests reliable with subsequent forensic analysis repeatedly confirming the results.. The drugs were lodged as evidence.

**August 7, 2026, Incident**

10. On August 7, 2026, Investigators received a phone call from a hotel in Portland, Oregon. The employee told investigators **GILL**, who they had identified from a known photograph we had previously supplied to them after the previous elude, had checked into room 218 at the hotel under the name "Ralph Hilton."

11. The same day I obtained a federal search warrant for **GILL's** hotel room, 218, signed by the Honorable Judge Armistead, United States Magistrate Judge.

12. Later the same day Investigators attempted to arrest **GILL** in the parking garage at the hotel. **GILL** was observed meeting with people in and around the vehicle he was driving and a Honda Ridgeline, parked next to his vehicle.

13. FBI SWAT attempted to arrest **GILL** on the arrest warrant; however, **GILL** was able to elude capture by driving away in his vehicle.

14. The search warrant on **GILL's** hotel room was executed the same day. Inside the room Investigators located a black Puma backpack, inside the backpack was a handgun. The handgun had a privately made lower receiver and Glock brand upper. The handgun was loaded with 9mm rounds in the magazine. In addition, in the room were 4 separate bags of methamphetamine with approximately 33.9 gross grams of methamphetamine inside them. Two separate bags with approximately 27.5 gross grams of fentanyl were located on the desk in the room. On the TV stand in the room Investigators recovered approximately 20.4 gross grams of methamphetamine which was loose on the stand. The fentanyl and methamphetamine were field

tested and both tested positive for their respective substances. Gill's Oregon ID card was also located in the room.

15. I later obtained and reviewed surveillance camera footage from the hotel for a short time prior to when **GILL** eluded capture. In reviewing the footage, I observed **GILL** in the parking garage of the hotel, carrying the same black Puma brand backpack where the 9mm handgun had been located later in his room.

**August 12, 2026, Arrest and Interview**

16. On August 12, 2026, I obtained a federal geolocation warrant for **GILL's** new telephone number and began monitoring it's location. On August 12, 2026, I noted the phone was geolocating at Peace Health hospital in Vancouver, Washington. Investigators went to that location and arrested **GILL** on his outstanding supervised release violation warrant.

17. **GILL** was interviewed after being advised of his constitutional *Miranda* rights. **GILL** admitted eluding capture in the Toyota 4-Runer, fleeing to Vancouver and ditching the car. He said he had neglected to grab the bag with the methamphetamine in it out of the vehicle. **GILL also** admitted to selling drugs for less than a year. **GILL** said he sold mainly methamphetamine and fentanyl and occasionally cocaine. He described prices he pays for bulk drugs and said he prefers to sell pounds and kilograms instead of ounces. He said that when he obtained drugs, he would not hold large amounts for very long and would sell them quickly. **GILL** admitted his DNA would "probably" be on the handgun found at the Inn at the Convention Center.

18. I reviewed **GILL's** criminal history and learned that on August 14, 2014 **GILL** was sentenced to 188 months in prison, following his federal conviction in the United States

District Court for Possession of Methamphetamine with Intent to Distribute, to be followed by five years of supervised release.

19. I know that fentanyl is a Schedule II controlled substance and an extremely powerful synthetic opioid that is approximately 100 times more potent than morphine and 50 times more potent than heroin. I know that 2 mg. of fentanyl can be a potentially fatal dose. I know that fentanyl traffickers regularly buy and sell bulk fentanyl pills (counterfeit M30 pills manufactured with fentanyl), as well as bulk fentanyl powder. I know a typical user of fentanyl will either buy powdered fentanyl or counterfeit M30 pills that they will then burn it on a piece of tin foil and inhale the fumes, sometimes by using a straw. Sometimes a user will simply ingest the pills or inhale the powdered fentanyl. I know that fentanyl addicts on the street do not regularly stockpile large amounts of fentanyl but rather tend to buy a small amount of what they need and then resupply themselves when they run out. I know that a user of powdered fentanyl will use it in quantities of less than 1/10 of a gram and will regularly buy it in amounts of less than a gram up to several grams at a time. I know that dealers of powdered fentanyl will often buy fentanyl in larger quantities and then break off and sell it in smaller qualities. I know that a person possessing 10 grams or more of fentanyl powder does not possess the fentanyl for personal use but rather such a quantity indicates that it is possessed for purposes of further distribution.

20. I am very familiar with methamphetamine and I know that methamphetamine is a Schedule II controlled substance. I also know from training and experience that methamphetamine in its illicit form is a highly addictive stimulant that causes both short-term and long-term psychiatric effects. Users of methamphetamine often experience extreme agitation, anxiety, paranoia, visual, and auditory hallucinations. Because methamphetamine is a

very potent stimulant, users of methamphetamine run the risk of seizures, elevated blood pressure, stroke, and death. I also know, based upon my training and experience, that methamphetamine is typically used in quantities of one-tenth (.1) to one-quarter (.25) of a gram, either intravenously or by being smoked. I know a gram of methamphetamine on the street can sell for around $10 to $20 and that users typically buy only a couple to a few grams at a time. I also know that drugs are typically sold based upon weight and that drug dealers will either prepackage drugs in certain amounts for sale or possess a scale so they can weigh out the drugs they are selling. Accordingly, I also know that a person possessing more than 10 grams of methamphetamine does not possess the methamphetamine for personal use but rather such a quantity indicates that it is possessed for purposes of further distribution.

21. I have been involved in numerous drug missions and arrests where firearms have been recovered and I have also talked with other Investigators who have also been involved in similar missions where firearms have been recovered. I know from my training and experience that drug traffickers regularly possess firearms as "tools of the trade" in furtherance of their drug trafficking activities for a variety of reasons, to include: first, having an accessible gun provides defense against anyone who may attempt to rob the trafficker of their drugs or drug profits; second, possessing a gun, and letting everyone know that you are armed, lessens the chances that a robbery will even be attempted; third, having a gun accessible during a transaction provides protection in case a drug deal turns sour; fourth, the visible presence of a gun during the transaction may prevent the deal from turning sour in the first place; and, fifth, having a gun may allow the drug trafficker to defend the "turf" area from which lower-level dealers operate for the trafficker.

**Conclusion**

22. Based on the foregoing, I have probable cause to believe, and I do believe, that **GILL** committed the Target Offenses and I therefore request that the Court issue a criminal complaint and arrest warrant for **GILL** for committing those offenses.

23. Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Scott Kerin and AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Nathan Hibbs, Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 2:35 p.m. on October 30, 2026.

HONORABLE JEFFREY ARMISTEAD
UNITED STATES MAGISTRATE JUDGE